UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ANGELA BRADLEY, | Case No. 4:20-cv-00337-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| AUTOZONERS, LLC, a Nevada limited liability company, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Angela Bradley brought this action against her former employer, Autozoners, LLC ("AutoZone"), alleging hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, and the Idaho Human Rights Act. Before the Court is AutoZone's Motion for Summary Judgment (Dkt. 24). In addition, AutoZone asserts various evidentiary objections and seeks leave to file supplemental declarations in support of those objections (Dkt. 38).

The Court heard oral argument on February 3, 2022, and now issues its decision. For the reasons explained below, the Court will deny AutoZone's motion for leave to file supplemental declarations and its motion for summary judgment.

## BACKGROUND

Angela Bradley began working for AutoZone as a parts sale manager in February 2016 at its Pocatello store. In January 2017, Bradley transferred to the Chubbuck store, where she worked until the date of her discharge in June 2019. *Bradley Dep.*, pp. 97-89, 98, Dkt. 31-3. As a part sales manager, Bradley reported to a store manager, who is responsible for enforcing AutoZone's policies, hiring, issuing written discipline with the district manager or regional human resource manager's review and approval, and completing performance evaluations. *Hancock Dep.* pp. 19-20, Dkt. 31-4; *Hernandez Decl.*, ¶ 15, Dkt. 24-5. The store manager cannot terminate employees but may request or recommend terminations based on that manager's experience and the employee's actions. *Hancock Dep.* pp. 19-20, Dkt. 31-4.

A store manager reports to a district manager, who, in turn, reports to a regional manager. For the duration of Bradley's employment with AutoZone, German Hernandez served as the district manager who oversaw 10 to 12 stores, including the AutoZone stores where Bradley worked, and Rodney Smith served as the regional manager. *Hernandez Decl.* ¶¶ 2-3, Dkt. 24-5; *Smith Dep.* p. 10-12,

Dkt. 31-9. Hernandez visited the Chubbuck store only once or twice a month. *Hernandez Dep.*, p. 14, Dkt. 31-6. Smith visited the Chubbuck store even less frequently than Hernandez – maybe once a year. *Smith Dep.* p. 10-12, Dkt. 31-9.

At the time of Bradley's termination, Timothy Hancock served as the Chubbuck store manager. Hancock began working as the Chubbuck store manager in late August 2018. As set forth in more detail below, Bradley alleges that Hancock began sexually harassing her soon after he began managing the Chubbuck store. Bradley reported Hancock's conduct to Hernandez in November 2018. *Hernandez Decl.* ¶ 7, Dkt. 24-5.

Rather than believing her and protecting her, Bradley maintains, AutoZone "treated her as a liar and left her to work with Hancock who was clearly angry about her report." *Pl.s Resp. Br.*, p. 2, Dkt. 31. She further alleges that, after she made her report, Hancock started "paper[ing] her file with numerous memos and corrective actions, all ratified by upper management and HR, and requested Bradley be terminated approximately four short months after he learned of the investigation." *Id.* On June 5, 2019, AutoZone, upon Hancock's recommendation, terminated Bradley's employment, citing performance and attendance issues.

## 1. AutoZone's Record of Ms. Bradley's Performance Prior to December 2018

Bradley worked for AutoZone for three years largely without incident. Bradley's performance evaluations in 2016 and 2017 indicate she "consistently

met expectations." *Casperson Decl.*, Ex. J, Dkt. 31-12 at 5, 11. In 2018, she

received a lower score on her performance evaluations from Hernandez, who

completed the performance evaluations that year because the Chubbuck store lost

its store manager. *Hernandez Decl.* ¶ 6, Dkt. 24-5. But, as Hernandez only visited

the Chubbuck store once or twice a month, he never worked directly with Bradley.

*Id.* ¶ 3. Hernandez also gave the three other managers, including the two other

"part sales managers," for the Chubbuck store the same lower rating. *Casperson*

*Decl.,* Ex. L, Dkt. 33-3 at 4, 10, 15.

Bradley did accrue "occurrence points" for absences during this three-year

period. AutoZone has a strict attendance policy and assigns automatic points for

absences. Occurrence points are assigned for each occurrence, are tracked on a

rolling 12-month period, and are posted daily in each store. *Store Handbook*, p. 27,

Dkt. 31-11 at 31. Even if an employee calls in with adequate notice and is sick, the

absence may result in occurrence points without a doctor's note. *Id.*, p. 28, Dkt. 31-

11 at 32 Given the strictness of the attendance policy, all employees accrued

attendance points, including Bradley. *Barnhill Dep.*, p. 77, Dkt. 31-8. After 90

consecutive days of perfect attendance, the oldest occurrence points fall off the

Attendance Report. *Store Handbook*, p. 27, Dkt. 31-11 at 31.

For the 12-month rolling period for 2017, Bradley amassed 10.5 points for

attendance violations. Her absences in 2017 included one when she was snowed in,

one when she was tardy because of daylight savings, and one for calling sick. *Riley Decl.*, Ex. D, Dkt. 24-10; Ex. H, 24-11; Ex. I, Dkt. 24-12. For the next 12-month rolling period until August 2018, when Hancock assumed the store manager position for the Chubbuck store, Bradley had amassed 6.5 points. Bradley received these points in 2018 twice for sick days with proper notification but without a doctor's note. *Id.*, Ex. J, Dkt. 24-13, Ex. K, Dkt. 24-14.

Other than accruing these attendance points under AutoZone's strict attendance policy, Bradley performed her job for AutoZone with little to no complaints from her managers for three years prior to Hancock's employment: Bradley's managers placed only two "Memos-to-File" in her personnel file for very minor issues, and the only "Corrective Actions" they issued related to the attendance points. This initially remained true when Timothy Hancock assumed the store manager position at the Chubbuck store at the end of August 2018. *Hancock Dep.*, pp. 44-45, Dkt. 31-4. Indeed, in September 2018, after working with Bradley for about a month, Hancock sent an email to Hernandez describing Bradley as a "little timid, but coming around," and stating, "I believe with the right coaching Angel could be a great #1 for the succession plan" – meaning that Bradley would be next in line for a higher management position. *Hancock Dep.* 57:16-58:11, Dkt. 31-4; *Hancock Dep.*, Ex. 4 & 5, Dkt. 33. But it all changed after Bradley reported Hancock for sexually harassing her in late November 2018.

### 2. Sexually Demeaning and Derogatory Conditions

Bradley alleges that Hancock began making offensive, sexual comments to her shortly after he began serving as the Chubbuck store manager in late August 2018. Bradley alleges several specific instances of sexual harassment, including:

- Shortly after Hancock began working at the Chubbuck store, Bradley was standing on her tip-toes, reaching up to the top shelf to right some bottles that had fallen over, and Hancock stood outside the office "leering" at her and repeatedly telling her to "reach." *Bradley Dep.*, pp. 41, 179-180, Ex. 25, Dkt. 31-3.

- Hancock told Bradley if she were to "get out of hand," he would do this, then he gestured with his hands very near her breast as though giving her a "titty twister." *Id.*, pp. 41-42, Ex. 25.

- One day, Bradley was explaining how sometimes the store is slow during the day and then sometimes "it explodes at night," meaning it gets busy at night. Hancock asked her to repeat her comment and then started laughing. Bradley realized Hancock had interpreted her comment in a sexual manner, and she felt humiliated. *Id.*, pp. 42, 195, 263, Ex. 25.

- Hancock approached Bradley from behind while she was working at the sales counter, reached around her with his phone and made her watch a sex

scene from the movie, *Step Brothers*. Bradley felt offended and physically

trapped against the counter by Hancock. *Id.*, pp. 203-05, Ex. 25.

- Hancock watched women in the store and helped those he found "pretty."

  *Id.*, p. 41, Ex. 25.

- Hancock referred to women he did not like as "c**ts" who had left the store

  when he was upset about the interaction he had with them. *Id.*

- Hancock told Bradley that when he writes up an employee and uses the

  term, "causes undue hardship to other Autozoners," it makes Hernandez's

  "weiner hard," *Id.*, p. 42.

- In another ladder incident, Hancock shook a ladder Bradley was climbing

  and gestured toward her breasts. *Id.*, pp. 179, 254, Ex. 25.

The last straw, according to Bradley, occurred on November 8, 2018.

Hancock brought in donut holes to work to share and asked Bradley if she wanted

some. Bradley took a couple and thanked Hancock. As Bradley was eating the

donut holes, Hancock asked her, "Do you like having my balls in your mouth?"

*Bradley Dep.*, pp. 167-68, Ex. 25. On the same day as the donut hole incident,

Hancock was watching Bradley working on a ladder. When she stopped and asked

why he was just staring at her, he said "his mind was in the gutter." Again, Bradley

found his conduct offensive and disturbing. *Bradley Dep.*, pp. 41-42, 181, 194,

204-05, 272, Ex. 25.

### 3. Bradley's Report of the Alleged Sexual Harassment and AutoZone's Investigation

Shortly after Hancock asked Bradley whether she liked having "his balls in [her] mouth," Bradley reported Hancock's behavior to Hernandez. Bradley felt Hernandez seemed dismissive. *Bradley Dep*., pp. 47-50, 52-55, Dkt. 31-3. When Bradley reported the incident to Hernandez, he did not tell her to report it directly to Human Resources; instead, he told her to send him a narrative statement. *Bradley Dep*., p. 58; Dkt. 31-3 *Hernandez Decl.* ¶ 7, Dkt. 24-5.

On November 16, 2018, Bradley provided a statement to Hernandez. *Bradley Dep*., pp. 97, 187, 111-112; Ex. 19 & 25, Dkt. 31-3. Bradley felt very nervous to work with Hancock after reporting his conduct, and she felt Hancock acted differently towards her. *Id.*, pp. 272; Ex. 24 & 25. As a specific example of this "different" treatment, Bradley says she called to verify her schedule on November 17, 2018, and spoke with another employee. Bradley discovered Hancock had changed her schedule without notifying her. Bradley would have been a no call/no show if she had not double checked, and she felt like Hancock "was trying to set her up." *Id.*, pp. 245-246, 263-64; Ex. 24.

Bradley heard nothing from AutoZone about the status of her report for a couple of weeks until she received a call from Cory Boothe, AutoZone's Regional Human Resources Manager, on November 30, 2018. Boothe served as the HR representative assigned to the region encompassing the Chubbuck store. According

to AutoZone's investigation policy, "An investigation is required when a complaint is received that potentially violates state, federal or local laws, violates company policy (with the exception of attendance violations), or can cause physical or emotional harm to an employee." *Boothe Dep.*, Ex. 7, Dkt. 31-7.

As part of his investigation, Boothe asked Bradley to come in to be interviewed, but Bradley was sick with the flu, which she tried to explain to Boothe. But he insisted that she come that day, so she agreed. Bradley requested they meet at the Pocatello store to avoid seeing Hancock. *Bradley Dep.*, pp. 199, 207-08, Dkt. 31-3. Boothe also interviewed Hancock and another parts sales manager, Jared Landon, who Bradley said witnessed the donut-hole incident. Boothe did not record any of the interviews he conducted as part of his investigation, but he prepared "transcripts" of the interviews, typing the answers as he listened. Id., pp. 83-85; Exs. 13, 14, 15.

Boothe interviewed Hancock first. Hancock denied sexually harassing Bradley and stated he believed Bradley was making up these allegations because she knew Hancock was "going to hold her accountable for her job performance and attendance issues." *Id.*, Ex. 13, Dkt. 33-1 at 65. Boothe then asked Hancock when he had last held Bradley "accountable" or gave documentation to her for her job performance or attendance. Hancock replied, "Back in September of this year," referring to the written reprimand Bradley received for inadvertently leaving the

safe open. *Id.* Boothe next interviewed Jared Landon, the male employee who Bradley said witnessed the donut hole incident. This interview lasted 15 minutes, and Landon denied hearing Hancock's comment about whether Bradley liked his balls in her mouth. He further stated that he had never witnessed Hancock acting unprofessionally. *Boothe Dep.*, Ex. 14, Dkt. 33-1 at 67.

After conducting these two interviews back-to-back, Boothe next interviewed Bradley. As noted, this interview occurred at the Pocatello store because Bradley did not want to see Hancock during the interview. In this interview, Boothe asked Bradley a few questions about her allegations of harassment against Hancock and asked if there were any witnesses to the events. Boothe then asked Bradley about her relationship with another employee who worked at the Pocatello store. Bradley had previously disclosed this relationship as required by AutoZone's Code of Conduct, and Bradley felt her relationship with this employee had nothing to do with her report against Hancock. *Bradley Dep.*, pp. 57, 97, 111-112, 197, Ex. 19.

Boothe also implied through his questions that Bradley had violated the Code of Conduct by waiting a week before reporting the donut hole incident. When Boothe suggested she transfer to the Pocatello store, Bradley felt she had made a mistake in making her report because she "knew it wasn't going to be taken seriously." *Bradley Dep.*, p. 190, Dkt. 31-3. Bradley perceived this "offer" to

transfer stores as a "threat," and she did not feel it was fair that she would have to transfer stores as a solution for her reporting Hancock's sexual harassment. *Id.*, p. 50, Dkt. 24-4.

In addition to conducting these interviews, Boothe testified he reviewed camera footage for the store to see if he could find evidence corroborating Bradley's allegations against Hancock. *Boothe Dep.*, pp. 92-96, Dkt. 31-7; *Smith Dep.*, pp. 20, Rule 30(b)(6), pp. 5-6, 9-10, 20, Dkt. 31-10. He apparently could not. But the Chubbuck store did not have cameras in the locations Boothe described. *Id.* Boothe completed his investigation in that one afternoon, and he testified that he entered his finding into APIS, AutoZone's software for tracking investigations. *Boothe Dep.*, Exs. 6, 7, 8, 9, & 10. But there is no evidence of it in the APIS system or any evidence of its conclusion. *Casperson Decl.* ¶ 14, Dkt. 31-2.

Boothe never told Bradley the results of the investigation, whether she or Hancock would switch stores, and she felt like she was left to deal with Hancock. *Bradley Dep.*, pp. 48-55, Dkt. 31-3. From Bradley's perspective, she felt neither Boothe nor Hernandez cared about the sexual harassment or having her tell the story of what happened. *Id.*, pp. 48-49, 56-58. Bradley says she did not even read Boothe's "transcript" of their interview before signing it because all she "wanted to do was get out of there."  *Bradley Dep.*, pp. 188-91, Dkt. 31-3.

After Bradley reported the harassment, she heard Hancock call a female customer a c**t after the customer had left the store, just as he had done before. *Id.*, p. 41 errata; Ex. 25. In addition, Bradley overheard Hancock having a telephone conference with someone from the Autozoner store about an employee from the Chubbuck store potentially transferring, and Hancock, referring to the employee, said, "she's not bad to look at." *Id.*, p. 169-170, errata; Ex. 25.

### 4. AutoZone's Record of Ms. Bradley's Performance After Her Report Culminating with Bradley's Termination.

#### A. December 2018 Corrective Action Review

Hancock had not issued any memos-to-file or corrective action reviews to Bradley since she inadvertently left the safe open in September 2018, soon after Hancock started as store manager. But, on December 4, 2018, days after Boothe's interview of Bradley and Hancock regarding Bradley's report of sexual harassment, Hancock issued a Corrective Action Review to Bradley, noting (1) she had come back from lunch 15 minutes late on November 28, 2018, and (2) that, on December 1, 2018, she was scheduled to work from 7:15 a.m. to 5 p.m., and she notified Hancock at 5:30 a.m. that she was sick and would not be in that day. *Riley Decl.*, Ex. Q, Dkt. 24-20.

#### B. January 2019 Memos-to-File

In January 2019, Hancock wrote an additional four memos-to-file about Bradley: one on January 26, 2019, one on January 27, 2019, and two on January

30, 2019, none of which Hancock discussed with her at the time he wrote the memos. *Hancock Dep*., p. 44, Ex. 9, Dkt. 31-4 at 32-35. In the first two January memos, Hancock complained Bradley had called another part sales manager to cover her shifts without first consulting with Hancock – once when Bradley's mother was in town and once because Bradley did not feel well. *Id.*, Dkt. 31-4 at 32-33.

For the first memo dated January 30, 2019, Hancock noted Bradley had not filled out the daily "Captain's Log," and that Hancock would coach Bradley "on the proper store opening tasks for a PSM." *Id.*, Dkt. 31-4 at 34.

In the second memo dated January 30, 2019, Hancock reported that Bradley had contacted him, stating her neck hurt and she needed to go home or to the doctor, and that Bradley had another employee cover her shift. *Id.*, Dkt. 31-4 at 35. Hancock noted that he told Bradley that they needed "to discuss her absences due to it causing a hardship on customer service and other AutoZoners." *Id.* On January 30, 2019, the day Hancock issued the memo for Bradley's absence, Bradley was ill and saw a doctor who excused her absence. *Hancock Dep*., Ex. 11, Dkt. 31-4 at 42.

After putting this flurry of secret memos in Bradley's file, Hancock sent an email to Hernandez with the subject line of "Angela Bradley," stating "German, Reference what we spoke of earlier, 3 memo to files have been added. Tim H." *Hancock Dep*., Ex. 10, Dkt. 33 at 5.

### C. Hancock's First Request for Bradley's Termination

On April 6, 2019, Hancock gave Bradley a corrective action for leaving a few minutes early from her shift after she asked another employee, who was already at the store and would not be in overtime, to cover the last few minutes of her shift because she needed to leave a little bit early. *Hancock Dep*. Ex. 15, Dkt. 31-4 at 52. This had never been an issue in the past if the shift was covered, and it did not create overtime. *Bradley Dep*., pp. 43, 132-35, 137, 147, Dkt. 31-3. Hancock also asserted Bradley had left early several times in the April 6, 2019 corrective action but did not specify when this had occurred. *Hancock Dep*. Ex. 15, Dkt. 31-4 at 52.

Based on Bradley's leaving her shift a few minutes early (after asking another employee to cover the rest of her shift) and on Bradley's supposedly leaving early on other unspecified occasions, Hancock requested that Bradley be fired or moved to a part-time sales position. *Id*. The April 6, 2019 corrective action from Hancock also stated Bradley had 8.5 attendance points. *Hancock Dep*. Ex. 15, Dkt. 31-4 at 52. However, according to AutoZone's records, Bradley had only 4 attendance points. *Hancock Dep.*, Ex. 7, Dkt. 31-4 at 29.[1]

---

[1] AutoZone claims that Hancock's statement regarding Bradley's having 8.5 attendance points was correct, *Defs' Evidentiary Obj*., p. 21, Dkt. 36-1, but its own records show that Bradley only had 4 points, *Hancock Dep.*, Ex. 7, Dkt. 31-4 at 29. This (Continued)

### D. *May Memos-to-File and Hancock's Second Request for Bradley's Termination*

On May 1, 2019, Bradley had been sick and provided a doctor's note for her absence. *Hancock Dep.*, Ex. 13, Dkt. 31-4 at 43. Unbeknownst to Bradley, Hancock put two memos in her file while she was out sick. *Hancock Dep.* Ex. 9, Dkt. 31-4 at 36-37. In the first memo, Hancock complained that "Bradley again called in stating she would not be in to work because her thyroid was acting up…." *Id.*, Dkt. 31-4 at 36.

In the second memo dated May 1, 2019, Hancock reported that he had done "a routine check of overstock accuracy," and he "noted several items which are in the overstock are that are not scanned into overstock." *Id.*, Dkt. 31-4 at 37. Although Hancock claims to have sent screen shots of alleged overstock discrepancies to Hernandez, Hernandez could not find them, and AutoZone did not otherwise have a record of the discrepancies. *Hernandez Dep.*, pp. 16-17, Dkt. 31-6.

On May 10, 2019, Hancock again placed a memo in Bradley's file, claiming her performance was inadequate with respect to her overstock duties because she failed to complete a "planogram," and because she delayed scanning in a few items into overstock. Bradley objected to Hancock's constant "singling her out" for

---

therefore appears to be a disputed fact, and, at the summary judgment stage, the Court must construe all evidence in Bradley's favor.

minor issues, *id.*, and reported the conduct to Hernandez. *Bradley Dep.*, pp. 151-52, 154, Dkt. 31-3. Hernandez spoke to Bradley and told her that she needed to be a "team player" and asked her to step down to a part-time sales position. *Bradley Dep.*, pp. 155-61. Hernandez placed a memo in her file on May 16, 2019. *Id.*

On May 23 and 27, 2019, Hancock placed two more memos in Bradley's file. *Id.*, 31-14 at 40-41. In memo dated May 27, 2019, Hancock specifically requested Bradley be terminated "due to lack of job performance." *Id.*, Dkt. 31-14 at 41.

### E. June Memo-to-File and Hancock's Third Request for Bradley's Termination

On June 4, 2019, Hancock again requested that Bradley be fired, asserting "Bradley has had numerous Memos to file and AAR's documenting her lack of performance." *Hancock Dep.*, Ex., 15, Dkt. 31-4 at 53. According to Hancock, "[w]ith her unwillingness to accept a lesser role within AutoZone store 3694[,] I have no recourse other than to ask for her termination." *Id.* Bradley testified that she did not recall being told by Hancock or Hernandez of many of her alleged performance deficiencies between April 6, 2019, and her termination on June 5, 2019. *Bradley Dep.*, pp. 158-163, Dkt. 31-3.

### 5. Bradley's Termination

On June 5, 2019, Hancock informed Bradley she was fired. *Bradley Dep.* pp. 163-165, Dkt. 31-3. Rodney Smith, the Regional Manager, with Boothe's input,

officially made the decision to fire Bradley. Boothe and Smith relied on the

corrective actions and memos to the file, which Hancock prepared, to fire Bradley.

Neither Smith nor Boothe had ever worked with Bradley. Indeed, Smith had only

visited the Chubbuck store three or four times when Hancock worked there, and he

does not remember her. *Boothe Dep.*, pp. 102-05, 111-14, 118-121, 124, Dkt. 31-7;

*Smith Dep*., pp. 12-13, 14-19, Dkt. 31-9. Likewise, Boothe rarely visited the

Chubbuck store and had no "firsthand knowledge" of Bradley's performance;

instead, he relied on the information he received from Hernandez and Hancock

because only "they would have firsthand knowledge of it." *Boothe Dep.*, p. 121,

Dkt. 31-7.

Another of Bradley's co-workers, Jared Landon, who was also a part sales

manager like Bradley, made no report of harassment. Hancock documented

multiple issues related to Landon's cash handling procedures, lack of personal

hygiene, falsification of a return, theft, damaging company equipment, lying to

Hancock, failing to audit the registers twice a day, treating female employees

disrespectfully, anger management problems on multiple occasions, customer

complaints, and problems with his girlfriend coming into the store and cornering

employees for information. *Hancock Dep*., pp. 144, 164-171, 173-175,178-179,

183-185; Ex. 16, Dkt. 33 at 6-21. Hancock never recommended or requested that

Landon be demoted or terminated. *Hancock Dep*., pp. 165-166,169-170, 179, 185,

Dkt. 31-4; Ex. 16, Dkt. 33 at 6-21. AutoZone did not fire or demote this employee. *Id.*

## LEGAL STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In deciding whether there is a genuine dispute of material fact, the Court must view the facts in the light most favorable to the nonmoving party. *Id.* at 255. "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Anderson*, 477 U.S. at 255). The court is prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *Id.*

## ANALYSIS

### 1. Evidentiary Objections and Motion to Supplement

AutoZone has filed a 27-page document, asserting 40 separate "evidentiary objections" to Plaintiff's Statement of Disputed Facts. AutoZone's argues that "Plaintiff's Statement of Disputed Facts and supporting papers contain and rely

upon facts and other evidence that are inadmissible under Federal Rules of Civil

Procedure 56(c)(2)(4), and 26(a)(2)(A)(C), Federal Rules of Evidence 602 and

802, and the sham affidavit rule." *Def's Obj.,* p. 2, Dkt. 36-1.

### A. *Objections Based on Lack of Foundation or Misstating the Evidence*

Federal Rule 56(c) governs the procedures that the parties must comply with

to support or dispute a motion for summary judgment. See Fed.R.Civ.P. 56(c).

Under Rule 56(c)(2), a party "may object that the material cited to support or

dispute a fact cannot be presented in a form that would be admissible in evidence."

*Id*. In determining admissibility for summary judgment purposes, it is the contents

of the evidence rather than its form that must be considered. *Fraser v. Goodale*,

342 F .3d 1032, 1036–37 (9th Cir.2003). If the contents of the evidence could be

presented in an admissible form at trial, those contents may be considered on

summary judgment. *Id.*

Here, with only a few exceptions, AutoZone objects to Bradley's cited

evidence as lacking foundation and misstating the evidence. By way of example,

AutoZone objects to paragraph 42 of Bradley's Statement of Disputed Facts, which

states, "Boothe testified he completed the investigation, but there is no evidence of

it in the APIS system or any evidence of its conclusion. In addition, Boothe

testified he reviewed camera footage for the store, but according to Autozoner, the

Chubbuck store did not have cameras in the locations Boothe described." *Id.*, p. 18.

In support of its objection to this paragraph, AutoZone cites to evidence that supports Bradley's statement that a record of the investigation does not exist in the APIS system but attempts to explain why such a record might not exist. *Id.* AutoZone also states that Boothe interviewed Bradley, Hancock, and the only witness Bradley identified, which appears to have nothing to do with the cited evidence to which AutoZone objects. *Id.*

Likewise, AutoZone objects to paragraph 47 for lack of foundation and misstating the evidence. This paragraph states, "Hancock also asserted Bradley left early several times in the April 6, 2019 corrective action, but failed to identify when." In the April 6, 2019 corrective action, Hancock did not specify what dates Bradley left early. *Hancock Dep.*, Ex. 15, Dkt. 31-4 at 52. AutoZone objects to this statement on the grounds that "Mr. Hancock would have known what dates Plaintiff left early and how early she had clocked out from reviewing time records." *Def's Obj.*, p. 20, Dkt. 36-1.

In a final example, AutoZone objects to paragraph 53, which provides, "On May 23 and 27, 2019, Hancock placed two more memos in Bradley's file. Hancock specifically requested that Bradley be terminated." In the May 27, 2019 memo, Hancock states: "I am requesting the termination of PSM Bradley due to lack of job performance." *Hancock Dep.*, Ex. 9, Dkt. 31-14 at 4. AutoZone claims paragraph 53 "misstates the evidence" because "[n]owhere in the May 23, 2019

memo does Mr. Hancock give his opinion that Plaintiff should be discharged." *Def's Obj.*, pp. 2223, Dkt. 36-1. AutoZone then argues that Mr. Hancock's explicitly requesting Bradley be terminated "is not relevant given that all a Store Manager can do is give an opinion to a District Manager that someone should be fired…." *Id.*

As these examples illustrate, AutoZone's "evidentiary objections" are improper because they are not limited to addressing the *admissibility* of Bradley's evidence, as required by Federal Rule of Civil Procedure 56(c)(2), "but instead discuss the evidence's meaning, import, etc., and delve into why [AutoZone] believes the evidence compels different conclusions." *Dickinson Frozen Foods, Inc. v. FPS Food Process Sols. Corp.*, No. 1:17-CV-00519-MMB, 2021 WL 5567300, at *2 (D. Idaho Nov. 29, 2021). "[T]he point of Rule 56(c)(2) is to allow for a procedure to objecting to *admissibility* of *cited evidence*." *Id.* (emphasis in original). "It is not to allow a party to submit as much argument as it wishes relating to the other party's cited evidence." *Id.* Thus, to the extent AutoZone uses its objections as an opportunity to make arguments about the *meaning* of the evidence, or why AutoZone *disagrees* with how Bradley characterizes the evidence, rather than arguing why the cited evidence is inadmissible, the Court disregards the objections based on lack of foundation and misstating the evidence as improper under Rule 56(c)(2).

## B. Sham Affidavit Rule

AutoZone's argument that certain paragraphs of Bradley's errata should be stricken as a corollary to the sham affidavit rule is equally unavailing. "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Van Asdale v. Int'l Game Tech*., 577 F.3d 989, 998 (9th Cir. 2009). The sham affidavit rule is necessary because "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th Cir. 1991).

"At the same time, however, it must be recognized that the sham affidavit rule is in tension with the principle that a court's role in deciding a summary judgment motion is not to make credibility determinations or weigh conflicting evidence." *Van Asdale*, 577 F.3d at 998. "Aggressive invocation of the rule also threatens to ensnare parties who may have simply been confused during their deposition testimony and may encourage gamesmanship by opposing attorneys." *Id.* For this reason, the Ninth Circuit has admonished that the rule should be applied with caution. *Id.*

In line with this admonishment, the Ninth Circuit has limited the rule to cases where (1) the affidavit or later testimony is "actually a sham" and (2) the inconsistencies are "clear and unambiguous." *Id.* Courts analyzing the rule look to whether subsequent testimony "flatly contradicts" previous testimony. *Id.* "The non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony." *Id.*

Nothing in Bradley's initial deposition testimony flatly contradicts her later errata correction or otherwise indicates her errata testimony is a "sham." Bradley's errata sheet clarifies that she heard Hancock refer to a female customer as a "c**t" after making her report of his alleged harassment. This clarification appears to contradict Bradley's statement that Hancock's sexually offensive comments stopped after she reported his conduct. But she explains that her correction seeks to clarify that Hancock "did not direct sexually harassing comments or actions" towards her after she reported him, but he did continue to make "inappropriate degrading and insulting comments regarding other women in [her] presence." *Pl's Resp. to Obj.*, p. 6, Dkt. 41. Her errata therefore does not "flatly contradict" her deposition. In fact, her errata correction is entirely consistent with her prior statements that Hancock's "behavior did not change" after she reported him, and he "again called a female customer a "c**t." *Bradley Dep.*, Ex. 25, Dkt. 31-3 at 82. Given this consistency between Bradley's statements prior to the deposition and

her errata, the Court therefore finds no basis to conclude this errata correction is a "sham."

Similarly, Bradley's errata correction that she overhead Hancock describe a female employee transferring to another store as "not bad to look at" after Bradley made her report does not flatly contradict her deposition testimony that she "did not know" whether he made this comment before or after her report. As Hancock made the comment with respect to a specific event, i.e., the employee's transfer to another store, after Bradley received the deposition transcript and had an opportunity to reflect when this transfer occurred, she was able to remember when the transfer and comment occurred – which was after she made her report. *Pl's Resp. to Obj.*, p. 6, Dkt. 41. This errata correction is also consistent with Bradley's prior statement that she overheard Hancock "describe[] another employee looking to transfer to another store as 'not bad to look at' as part of her qualifications" *after she made her report. Bradley Dep.*, Ex. 25, Dkt. 31-3 at 82. Again, therefore, the Court finds no basis to conclude this errata correction is a sham. Accordingly, AutoZone's objections to Bradley's errata corrections based on the sham affidavit are overruled.

As the Court overrules or disregards as improper AutoZone's evidentiary objections, the Court will likewise deny AutoZone's motion for leave to file supplemental declarations in support of AutoZone's objections. This does not

mean that Court endorses Bradley's factual account, or that it relies on Bradley's characterization of the evidence. But where disputed material facts exist, the Court adheres to the axiom that Bradley's version of the facts must be believed, and all justifiable inferences must be drawn in her favor. *Tolan*, 572 U.S. at 651. ("In articulating the factual context of the case, the Fifth Circuit failed to adhere to the axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.") (citation, brackets, and quotations marks omitted).

## 2.  Motion for Summary Judgment

Bradley brings claims under Title VII and the Idaho Human Rights Act. The Idaho Supreme Court has held that the same legal standards applicable in Title VII cases govern actions under the Idaho Human Rights Act. *Bowles v. Keating*, 606 P.2d 458, 462 (Idaho 1979). Accordingly, any discussion in this decision regarding Bradley's Title VII claims also applies to her Idaho Human Rights Act claims.

### A.  Hostile Work Environment

Under Title VII, it is unlawful for an employer to discriminate against an individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000e–2(a)(1). "This includes a prohibition against the creation of a hostile work environment." *Reynaga v. Roseburg Forest Products*, 847 F.3d

678, 686 (9th Cir. 2017). (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21

(1993); *Woods v. Graphic Comm'ns*, 925 F.2d 1195, 1200 (9th Cir. 1991)).

To establish a prima facie case of a hostile work environment, a plaintiff

must demonstrate (1) she was subjected to verbal or physical conduct of a sexual

nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently

severe or pervasive to alter the conditions of her employment and create an abusive

work environment. *See Hardage v. CBS Broadcasting, Inc.*, 427 F.3d 1177, 1183

(9th Cir. 2005); *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 642 (9th Cir. 2003). "The

working environment must both subjectively and objectively be perceived as

abusive," and the objective analysis is done "from the perspective of a reasonable

woman." *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017)

(quoting *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995) (internal

quotation marks omitted); *see also Faragher v. City of Boca Raton*, 524 U.S. 775,

788 (1998).

### (1) Prima Facie Case

AutoZone does not meaningfully dispute that the first two elements are met

here – that Bradley was subjected to verbal or physical conduct of a sexual nature

and that the conduct was unwelcome. The Court further concludes that Hancock's

conduct meets the requirement of being both subjectively and objectively hostile.

Bradley testified that she felt Hancock's comments and actions—particularly the

donut hole incident—were abusive and made her feel uncomfortable. The conduct also meets the objective standard – a reasonable woman in Bradley's position could feel that Hancock's comments and actions were hostile, demeaning, and abusive. Thus, Bradley's prima facie showing turns on whether Hancock's actions were pervasive and serious enough to amount to "a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788; *see also Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007).

In determining whether a work environment is sufficiently hostile, the Court must look "at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.*, *Inc.*, 510 U.S. 17, 23 (1993)). "While simple teasing, offhand comments, and isolated incidents (unless extremely serious) are not sufficient to create an actionable claim under Title VII, the harassment need not be so severe as to cause diagnosed psychological injury." *Fuller*, 865 F.3d at 1161-63 (citations and internal quotation marks omitted).  "It is enough if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay in her position." *Id*. (quoting *Faragher*, 524 U.S. at 788) (internal quotation marks omitted.).

Viewing the facts in the light most favorable to Bradley, the evidence shows, between early September through mid-November 2018, Hancock made sexually-charged statements and gestures to Bradley including: (1) Hancock "leering" at Bradley and telling her to "reach" as she climbed a ladder; (2) Hancock's suggesting he would perform a "titty twister" on the Bradley; (3) Hancock's making comments to Bradley about making Hernandez's "weiner hard"; (4) Hancock's shaking a ladder with Bradley on it and pointing at her breasts; (5) Hancock's asking Bradley to repeat her comment about the store "exploding at night" and laughing; (6) Hancock's calling women in the store "pretty" if he liked them,  or "c**ts" if he did not like them; (7) Hancock's physically trapping Bradley and forcing her to watch a sex scene from a movie on his phone; (8) Hancock's offering Bradley donut holes and asking Bradley if she liked "his balls in [her] mouth" when she ate them; and (9) Hancock's staring at Bradley and telling her that his mind was "in the gutter" the same day as the "donut hole incident."

The Ninth Circuit has "repeatedly held that sexual-based conduct that is abusive, humiliating or threatening is sufficient to make a prima facie claim under Title VII," *Craig*, 496 F.3d at 1056, and has found liability in situations involving conduct on par with Hancock's comments and actions in this case. *See, e.g., Ellison v. Brady*, 924 F.2d 872, 873, 880 (9th Cir.1991) (reversing a summary

judgment grant for the employer, finding that a reasonable woman could find a colleague's misguided "love letter" hostile and abusive, and holding that "[w]ell-intentioned compliments by co-workers or supervisors can form the basis of a sexual harassment cause of action"); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1461–63 (9th Cir.1994) (reversing a grant of summary judgment where a plaintiff's supervisor called her "offensive names based on her gender," confronted her in front of other employees and customers and criticized her using derogatory, gender-based language).

Hancock's actions, when viewed from his perspective, might seem innocuous enough.  But, when viewed from the perspective of a "reasonable woman," his behavior could be perceived as so obnoxious that it "pollute[d] the workplace," making it more difficult for Bradley "to do her job, to take pride in her work, and to desire to stay in her position." *Fuller*, 865 F.3d at 1162; *see also Ellison*, 924 F.2d at 877. Bradley alleges that Hancock's comments began almost immediately after he became Bradley's supervisor and continued with frequency until Bradley reached the breaking point when Hancock asked her if she liked having "his balls in [her] mouth." Prior to this, in addition to his repeatedly making sexually charged comments and gestures toward Bradley directly, Hancock casually commented on women's appearances and called women he did not like "c**ts" – "the essence of a gender-specific slur." *Reeves v. C.H. Robinson*

*Worldwide, Inc.*, 594 F.3d 798, 812 (11th Cir. 2010). Bradley further alleges that she felt physically threatened when Hancock essentially trapped her and made her watch a sex scene from a movie on his phone, reached in front of both her breasts to demonstrate the "titty twister," and trapped her on the ladder. All of these alleged statements and gestures occurred in a short two-and-a-half-month period.

These facts, as construed in Bradley's favor, are sufficient to raise a triable issue of fact as to the existence of a hostile work environment. As the Ninth Circuit explained in *Ellison*, "[s]exual harassment is a major problem in the workplace," and "[a]dopting the victim's perspective ensures that courts will not sustain ingrained notions of reasonable behavior fashioned by the offenders." *Ellison*, 924 F.2d at 877. "By acknowledging and not trivializing the effects of sexual harassment on reasonable women, courts can work towards ensuring that neither men nor women will have to 'run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living.'" *Id.* (quoting *Henson v. Dundee*, 682 F.2d 897, 902 (11th Cir. 1982)).

### (2) Vicarious Liability

AutoZone argues that even if Bradley can state a prima facie case for a hostile work environment claim, she cannot establish that AutoZone should be held vicariously liable for Hancock's actions because Hancock did not qualify as a supervisor within the meaning of Title VII. The Court disagrees.

Under Title VII, "[i]f the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions"—that is, if the employer knew or should have known of the harassment yet failed to take prompt and appropriate corrective action. *Vance v. Ball State Univ.* 570 U.S. 421, 424 (2013). Different rules apply if the harasser is the victim's supervisor. *Id.* In those cases, a non-negligent employer may become vicariously liable if the agency relationship somehow aids the victim's supervisor in his harassment. *Id.*; *see also Faragher*, 524 U.S. at 801–04; *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761-62 (1998). "Under this framework, therefore, it matters whether a harasser is a "supervisor" or simply a co-worker." *Vance*, 570 U.S. at 424.

An employee is a "supervisor" for purposes of vicarious liability under Title VII only if the employer has empowered that employee to take tangible employment actions against the victim. *Id.* AutoZone empowered only its regional managers to take tangible employment actions. It therefore argues that Hancock did not qualify as a "supervisor" because he lacked the ability to take any tangible employment action against Bradley without first obtaining approval from higher management.

But an employer may not insulate itself from liability for workplace harassment "by empowering only a handful of individuals to take tangible employment actions." *Id.* at 447. If an employer attempts "to confine

decisionmaking power to a small number of individuals, those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee." *Id.* (citing *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 509 (7th Cir. 2004) (Rovner, J., concurring in part and concurring in judgment) ("Although they did not have the power to take formal employment actions vis-à-vis [the victim], [the harassers] necessarily must have had substantial input into those decisions, as they would have been the people most familiar with her work— certainly more familiar with it than the off-site Department Administrative Services Manager"). "Under those circumstances, the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." *Id.*

Here, the record demonstrates AutoZone effectively delegated to Hancock the power to take tangible employment actions against Bradley. At the time of Bradley's termination, Rodney Smith served as the Regional Manager for the region encompassing the Chubbuck store where Bradley worked. Only he had the authority to approve Bradley's termination. Mr. Smith oversaw 108 stores in his region, including the Chubbuck store, and approximately 1,300 employees. *Smith Dep.* p. 10-12, Dkt. 31-9. Smith does not remember meeting Bradley. *Id.*, p. 12. The only information he knew about Bradley before making the decision to

terminate her employment came from documentation provided to him by Regional

Human Resources Manager Cory Boothe.

Boothe had met Bradley only once when he interviewed her regarding her

sexual harassment allegations against Hancock. Otherwise, Boothe never directly

observed Bradley's performance – and certainly not on a daily basis, or even a

weekly or monthly basis. The only information Boothe possessed regarding

Bradley's performance came from documentation in Bradley's file. This

information included all of Hancock's memos-to-file and corrective action reviews

recommending Bradley's termination. Indeed, Boothe admitted he based his

recommendation to Smith to terminate Bradley solely on the information he

received from Hernandez and Hancock because only "they would have firsthand

knowledge of it." *Boothe Dep.,* p. 121. Dkt. 31-7.  But even Hernandez hardly had

"firsthand knowledge" of Bradley's performance given he visited the store, at

most, twice a month and did not regularly interact with Bradley or otherwise

actively participate in management of the store. Only Hancock interacted with

Bradley on a daily basis, and only he had the personal knowledge to assess

Bradley's performance.

Like the "off-site" manager who did not "interact with the affected

employee" offered as an example in *Vance*, the record here demonstrates that the

AutoZone managers authorized to take tangible employment actions possessed a

limited ability to exercise independent discretion when making decisions and instead relied on Hancock's recommendation and assessment of Bradley's performance. 570 U.S. at 447. Although AutoZone did not empower Hancock with final decision-making authority, he necessarily had substantial input into those decisions with respect to Bradley, as he was the person most familiar with her work—certainly more familiar than Smith, Boothe, and even Hernandez, who observed Bradley twice a month at the very most. *Id.* Under these circumstances, Autozone "may be held to have effectively delegated the power to take tangible employment actions" to Hancock. *Id.*; *c.f. Equal Emp. Opportunity Comm'n v. AutoZone, Inc*., 692 F. App'x 280, 283 (6th Cir. 2017) (AutoZone store manager not a supervisor when manager empowered to take tangible employment actions "visited the store once a week, actively participated in its management, scheduled shifts, and interacted with the employees [co-worker] harassed); *McCafferty v. Preiss Enters., Inc.*, 534 Fed.Appx. 726, 731 (10th Cir. 2013) (co-worker with potential to influence decisions was not supervisor when actual supervisor visited the restaurant "nearly every day").

### (3) Reasonable Care Defense

If no tangible employment action is taken as a result of the discrimination, an employer may still escape liability for a supervisor's harassment "by establishing, as an affirmative defense, that (1) the employer exercised reasonable

care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Vance*, 570 U.S. at 424; *see also Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1184 (9th Cir. 2005).

"Notice of sexually harassing conduct triggers an employer's duty to take prompt corrective action that is reasonably calculated to end the harassment." *Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir 2001) (internal quotation marks omitted). The Court considers the totality of the circumstances to determine whether the employer's response to a complaint was appropriate. *Hardage*, 427 F3d at 1186. At a bare minimum, the employer must conduct an investigation when it receives a complaint of harassment. *Swenson*, 271 F3d at 1193. "The employer also must take disciplinary action against the harasser, although it need not label the action 'discipline.'" *Erickson v. Daimler Trucks N. Am., LLC*, No. CV-10-0132-ST, 2011 WL 4753534, at *11 (D. Or. July 20, 2011) (citing *Star v. West*, 237 F.3d 1036, 1039 (9th Cir. 2001)).

"Effectiveness [of the employer's remedy] will be measured by the twin purposes of ending the current harassment *and* deterring future harassment—by the same offender or others." *Fuller v. City of Oakland, Cal.*, 47 F.3d 1522, 1528 (9th Cir. 1995), as amended (Apr. 24, 1995) (emphasis added). Title VII condemns the risk of future harassment "every bit as much" as the "existence of past

harassment." *Id.* "Employers have a duty to express strong disapproval of sexual harassment, and to develop appropriate sanctions." *Id.* (quoting *Ellison*, 924 F.2d at 881) (quoting 29 C.F.R. § 1604.11(f) (internal quotation marks and brackets omitted)).

While the record establishes that AutoZone made some efforts "to prevent and correct promptly any sexually harassing behavior" by having Boothe investigate Bradley's complaint, questions of fact remain concerning the adequacy of AutoZone's response. "An investigation is a key step in the employer's response,…but the 'fact of investigation alone' is not enough." *Swenson v. Potter*, 271 F.3d 1184, 1193 (9th Cir. 2001) (quoting *Fuller v. City of Oakland*, 47 F3d 1522, 1529 (9th Cir. 1995)). An inadequate investigation or an investigation conducted in bad faith does not "satisfy the employer's remedial obligation." *Id. See also Erickson*, 2011 WL 4753534, at *13 (citing *Fuller v. City of Oakland*, 47 F3d 1522, 1529 (9th Cir. 1995) and *Hathaway v. Runyon*, 132 F.3d 1214, 1224 (8th Cir. 1997)).

AutoZone commenced its investigation on November 30, 2018, approximately two weeks after Bradley reported Hancock's conduct to Hernandez. Boothe, the HR representative, came to the store and interviewed Hancock and another employee, as well as Bradley. Boothe first interviewed Hancock and the other employee before interviewing Bradley. Boothe's interview of Hancock lasted

less than an hour. Hancock denied Bradley's accusations and accused her of making the report because she knew he would "hold her accountable for her job performance and attendance issues" even though Hancock had written up Bradley only once for accidentally leaving the safe open and had never written her up for "attendance issues" prior to her making the report. Boothe only interviewed the other employee, Jared Landon, for a total of 15 minutes, and Boothe did not attempt to interview any other of Bradley's co-workers. When Boothe finally interviewed Bradley after interviewing Hancock and Landon, Bradley maintains he turned the interview into threats against her as opposed to an inquiry into Hancock's behavior. Boothe also claims that he reviewed camera footage from the store as part of his investigation, but the Chubbuck store did not have cameras in the locations he described.

Boothe wrapped up the investigation in that one afternoon, and he testified he entered his findings into the APIS system soon after he completed the investigation. Boothe, however, failed to produce a written report of the investigation or inform Bradley of the results of the investigation. During his interview of Bradley, Boothe told her that she could switch to the Pocatello store if she did not want to continue working with Hancock.  However, Bradley wanted to stay at the Chubbuck store and did not feel she should have to switch stores when she had done nothing wrong. As Boothe never followed up with Bradley after her

interview or gave her any option to avoid Hancock except for her transferring stores, she felt she was left to handle the situation on her own. She further alleges that Hancock continued to call female customers he did not like "c**ts," and that she overhead Hancock commenting on another female employee's appearance after she made her report. From these facts, a jury could conclude that AutoZone's response to Bradley's report of Hancock's conduct was insufficiently thorough and not conducted in good faith. *See, e.g., Hathaway*, 132 F.3d at 1224.

AutoZone seems to suggest that its response to Bradley's complaints was sufficient because Bradley's allegations were uncorroborated, and therefore it would have been inappropriate for AutoZone to take any action against Hancock. *Def's Opening Br.*, p. 9, Dkt. 24-1 ("Any disagreement with the outcome of the investigation by Plaintiff does **not** amount to AutoZone failing to exercise reasonable care in responding to her complaint."). "An employer whose sole action is to conclude that no harassment occurred cannot in any meaningful sense be said to have "remedied" what happened." *Fuller*, 47 F.3d at 1529. "Denial does not constitute a remedy," *id.,* "and an employer may take remedial action even where a complaint is uncorroborated," *Hathaway*, 132 F.3d at 1224.

Nor can the offer of transfer back to the Pocatello necessarily be counted as sufficient: "harassment is to be remedied through actions targeted at the *harasser*, not the victim." *Fuller*, 47 F.3d at 1529 (alterations, quotations marks, and citation

omitted) (emphasis in the original). At a bare minimum, AutoZone could have "reminded" Hancock of its sexual harassment policy, but there is no evidence that AutoZone even did that. The Court therefore cannot find as a matter of law that AutoZone exercised reasonable care to prevent and correct sexual harassment.

Nonetheless, even if AutoZone could establish as a matter of law that it established the first prong of the affirmative defense, its defense fails on the second prong because AutoZone cannot show that Bradley "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer." *Craig*, 496 F.3d at 1057 (internal quotation marks omitted). AutoZone suggests that Bradley unreasonably delayed reporting the harassment because it started in early September 2019, and she delayed two and a half months in reporting it. But the Court cannot find as a matter of law that a two-and-a-half-month delay was unreasonable under the circumstances. An employee in Bradley's position may have hoped the situation "would resolve itself without the need of filing a formal complaint, and she justifiably may have delayed reporting in hopes of avoiding what she perceived could be adverse—or at least unpleasant—employment consequences." *Id.* And a relatively short two-and-a-half month delay is markedly different from the case AutoZone cites, or other cases, where the victim waited years before reporting the alleged harassment. *Def's Opening Br.*, p. 9, Dkt. 24-1 (citing *Murray v. City of Bonners Ferry*, No. 2:15-CV-00081-REB, 2017 WL

4318738, at *6 (D. Idaho Sept. 28, 2017) (finding an three-year delay

unreasonable); *see also Holly D. v. California Inst. of Tech.,* 339 F.3d 1158, 1178

(9th Cir. 2003) (noting plaintiff waited two years from first incident and a full year

of unwelcome conduct before reporting the harassment); *Montero v. AGCO Corp*.,

192 F.3d 856, 863 (9th Cir.1999) (finding a two-year delay in reporting the

conduct to be unreasonable); *Kohler v. Inter–Tel Techs.*, 244 F.3d 1167, 1180–82

(9th Cir. 2001) (holding that failure to report the behavior to the company was

unreasonable).

Because AutoZone cannot meet each of the elements of the reasonable care

defense as a matter of law, it is not entitled to summary judgment on Bradley's

Title VII sexual harassment claim.

### B. Retaliation

To establish a prima facie case of retaliation, Bradley must establish that

"(1) she engaged in a protected activity, (2) she suffered an adverse employment

action, and (3) there was a causal link between her activity and the employment

decision." *Stegall v. Citadel Broadcasting Co*., 350 F.3d 1061, 1065–66 (9th Cir.

2003). "Causation sufficient to establish the third element of the prima facie case

may be inferred from ... the proximity in time between the protected action and the

allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371,

1376 (9th Cir. 1987).

If Bradley establishes a prima facie retaliation claim, the familiar burden-shifting scheme set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1035 (9th Cir. 2006). Under *McDonnell Douglas*, once Bradley makes out a prima facie retaliation case, the burden shifts to AutoZone to articulate some legitimate, non-retaliatory reason for the challenged action. If AutoZone meets its burden, Bradley must then show that the articulated reason was merely a pretext for a retaliatory motive.

AutoZone concedes that Bradley engaged in protected activity but challenges Bradley's ability to show that she suffered an adverse employment action that was causally connected to her protected activity. Alternatively, AutoZone contends that Bradley cannot show that its reasons for terminating her were pretextual.

### (1) Prima Facie Case

Bradley's termination indisputably constitutes an adverse employment action. But AutoZone insists that nothing else it did can possibly qualify as an adverse employment action because only Bradley's termination "materially affect[ed] the compensation, terms, conditions, or privileges of employment," and too big a gap exists between Bradley's report and her termination to establish causation. *AutoZone's Opening Br.*, p. 11, 13 Dkt. 24-1 (quoting *Martin v. Idaho,*

*Dep't of Corr.*, No. CV-06-55-S-BLW, 2007 WL 1667597, at *4 (D. Idaho June 7,

2007)). The Court again disagrees.

"An adverse employment action includes any activity that a reasonable

employee would have found materially adverse, which in this context means it well

might dissuade a reasonable worker from making or supporting a charge of

discrimination." *Reece v. Pocatello/Chubbuck Sch. Dist. No. 25*, 713 F. Supp. 2d

1222, 1229 (D. Idaho 2010) (citing *Burlington Northern and Santa Fe Ry. Co. v.*

*White*, 548 U.S. 53, 68 (2006). "It is an objective standard." *Id.* "But context

matters." *Id.* (quoting *Burlington Northern*, 548 U.S. at 69) (alteration and internal

quotation marks omitted)). "The real social impact of workplace behavior often

depends on a constellation of surrounding circumstances, expectations, and

relationships...., and an act that would be immaterial in some situations is material

in others." *Burlington Northern*, 548 U.S. at 69.

Applying this standard, the Court concludes that AutoZone took actions

against Bradley – in addition to her termination – that "could well dissuade a

reasonable [employee] from making or supporting a charge of discrimination."

*Burlington Northern*, 548 U.S at 70. Within days of AutoZone's interviewing

Hancock – during which Hancock claimed Bradley had accused him of sexual

harassment because she knew he would "hold her accountable" for her attendance

and performance issues, even though he had not cited her for such issues prior to

her report – Hancock gave Bradley a written corrective action and occurrence points for being a few minutes late from lunch and having an absence without proper notification. Hancock had never given Bradley occurrence points for being a few minutes late leaving or returning to lunch. In fact, Hancock had not issued a written corrective action against Bradley for attendance or performance issues prior to her report, other than the corrective action he gave Bradley in early September 2018 for her accidentally leaving the safe in the back office open.

This December 2018 corrective action marked only the beginning of a flurry of memos-to-file and corrective actions Hancock issued against Bradley over the next few months until her termination in June 2019. Prior to making her report, Bradley had only two coaching memos placed in her file – one in January 2017 and the other in June 2017, two years earlier. In the six-month period between making her report and her termination, Hancock placed ten coaching memos in Bradley's file. Hancock issued four of those in January 2019 - one on January 26, 2019, one on January 27, 2019, and two on January 30, 2019. Hancock then sent an email to Hernandez with the subject line of "Angela Bradley," stating "German, Reference what we spoke of earlier, 3 memo to files have been added. Tim H." *Hancock Dep.*, Ex. 10, Dkt. 33 at 5.

Hancock took a brief respite but then resumed his spree on April 6, 2019, when he gave Bradley a corrective action for leaving a few minutes early from her

shift and having another employee who was already at the store cover the last few

minutes of her shift. For this relatively minor issue, Hancock requested Bradley's

termination. Hancock then placed six memos in Bradley's file during the month of

May – two of which he placed in her file when Bradley was out sick with a

doctor's note. In one of the May memos, Hancock noted that Bradley objected to

his "singling her out" for minor issues; Bradley reported Hancock's allegedly

retaliatory conduct to Hernandez. In his last May memo, Hancock again

specifically requested that Bradley be terminated.

On June 4, 2019, Hancock gave Bradley her third corrective action in six

months, stating he had "no recourse other than to ask for her termination" – citing

to all the memos and corrective actions he had issued against her in the previous

six months after she made her report. *Hancock Dep.*, Ex. 15, Dkt. 31-4 at 53.

Hancock notified Bradley of her termination the next day.

The three corrective actions Hancock issued prior to Bradley's termination

could constitute adverse employment actions. Courts take "an expansive view of

the type of actions that can be considered adverse employment actions" in the

context of retaliation claims. *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir.

2000). "For example, it is well established that efforts by an employer to scuttle a

former employee's search for a new job, such as by withholding a letter of

recommendation or by providing negative information to a prospective employer,

can constitute illegal retaliation within the meaning of ADEA and parallel anti-

retaliation provisions." *Passer v. Am. Chem. Soc.*, 935 F.2d 322, 331 (D.C. Cir.

1991). Similarly, "[u]ndeserved reprimands and threats of severe disciplinary

action may constitute adverse employment actions." *Reece,* 713 F. Supp.2d at 1230

(citing *Ray*, 217 F.3d at 1240-41). While each of these corrective actions,

individually, may not have made a dramatic impact on Bradley's job, "conduct

need not relate to the terms or conditions of employment to give rise to a retaliation

claim." *Reece*, 713 F. Supp. 2d at 1230 (citing *Burlington Northern*, 548 U.S at

70). And, of course, as stated, Bradley's termination obviously constitutes an

adverse employment action. AutoZone does not argue otherwise. Bradley therefore

easily satisfies this element.

The real rub lies with the causation element. Suspicious timing between the

protected activity and the allegedly retaliatory employment decision may raise an

inference of a causal connection. *Stegall v. Citadel Broadcasting Co*., 350 F.3d

1061, 1067–70 (9th Cir.2003). AutoZone argues that the seven-month gap between

Bradley's initial complaint to Hernandez and her termination is too long to

conclusively demonstrate causation. The Court might agree – if it were to ignore

everything that happened in between.

First of all, as discussed, a rational jury could find that the corrective action

Hancock issued against Bradley on December 4, 2018, constituted an adverse

employment action and that Bradley engaged in protected activity when she participated in the interview with HR on November 30, 2018. This would close the gap to a mere five days. This close timing alone is sufficient to establish a prima facie case of causation. *See Stegall*, 350 F.3d at 1067–70 (nine days between plaintiff's complaints of discrimination and her termination supports finding of causation); *Reece*, 713 F. Supp. 2d at 1230 (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)) (causation found where plaintiff reprimanded a month after engaging in protected activity).

Second, even counting Bradley's termination as the sole adverse employment action, the gap between her report and her termination is not fatal. "[A] specified time period cannot be a mechanically applied criterion. A rule that any period over a certain time is per se too long (or, conversely, a rule that any period under a certain time is per se short enough) would be unrealistically simplistic." *Coszalter v. City of Salem*, 320 F.3d 968, 986–87 (9th Cir. 2003). And evidence cannot be viewed in isolation. *Black v. Grant Cty. Pub. Util. Dist.*, 820 F. App'x 547, 552 (9th Cir. 2020) ("The dissent also errs in reviewing each piece of evidence in isolation."). Rather, if the collection of evidence, viewed holistically, reveals a "pattern of antagonism" following the protected conduct, this can also give rise to the inference of causation even if close temporal proximity is lacking. *Porter v. California Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005); *see also*

*Black*, 820 F. App'x at 552 ("But it is Black's *collection* of evidence, viewed holistically, that supports an inference of causation").

Bradley's collection of evidence, viewed holistically, supports an inference of causation. It would not be a stretch for a trier of fact to infer that Hancock's "papering" of Bradley's file with memos and corrective actions, which he started within days of his interview with HR regarding Bradley's allegations of sexual harassment, paved the way for Bradley's eventual termination six months later. Hancock only started holding Bradley "accountable" for her alleged performance and attendance issues *after* she made her report.

Hancock's newly minted mission to hold Bradley "accountable" for her alleged poor performance also appears to contradict his earlier assessment of Bradley – before she made her report – that she "could be a great #1 for the succession plan." This, together with the suspicious timing and the email Hancock sent Hernandez about adding three memos to Bradley's file, which could be viewed as a tacit admission by Hancock that he and Hernandez had a plan to lay the groundwork for Bradley's termination, is more than sufficient to state a prima facie case for unlawful retaliation.

Bradley has therefore established a *prima facie* case. Bradley's *prima facie* burden is not an onerous one. "[T]he requisite degree of proof necessary to establish a prima facie case for Title VII on summary judgment is minimal and

does not even need to rise to the level of a preponderance of the evidence."
*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061–62 (9th Cir.2002)
(internal quotation mark and citation omitted).

### (2) Pretext

"In Title VII retaliation cases, once the plaintiff has established a prima facie
case, the burden of production shifts to the defendant to articulate a legitimate,
nonretaliatory explanation for its decisions." *Yartzoff*, 809 F.2d at 1376. AutoZone
proffers legitimate reasons for Bradley's termination – namely her alleged
performance and attendance issues. "If the defendant carries the burden of
satisfactorily articulating a legitimate, nonretaliatory reason at trial, the legally
mandatory inference of retaliatory discrimination arising from the plaintiff's prima
facie case drops away." *Id.* The burden of production then shifts back to the
plaintiff to show the alleged explanation is a pretext for retaliation. *Id.*

"A plaintiff may demonstrate pretext in either of two ways: (1) directly, by
showing that unlawful discrimination more likely than not motivated the employer;
or (2) indirectly, by showing that the employer's proffered explanation is unworthy
of credence because it is internally inconsistent or otherwise not believable." *Earl v.*
*Nielsen Media Research, Inc.,* 658 F.3d 1108, 1113 (9th Cir. 2011) (citing *Chuang*
*v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000)).
"Evidence already introduced to establish the prima facie case may be considered,

and indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation." *Yartzoff*, 809 F.2d at 1376 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255, n. 10 (1981)) (internal quotation marks and brackets omitted). Accordingly, "a grant of summary judgment, though appropriate when evidence of discriminatory intent is totally lacking, is generally unsuitable in Title VII cases in which the plaintiff has established a prima facie case because of the 'elusive factual question' of intentional discrimination." *Id.* (citation omitted).

Bradley has furnished sufficient evidence to show pretext at the summary judgment stage. In particular, Bradley has introduced evidence that she received favorable performance evaluations in 2016 and 2017, and the performance evaluation she received in 2018 was commensurate with other employees in her store. Hancock had also identified Bradley as a good candidate for promotion to store manager. In addition, as previously noted, Hancock only began his campaign to hold Bradley accountable for her performance and attendance issues after she made her report and then he seemed to admit in his email to Hernandez that he had a plan to get Bradley fired. This evidence raises the specter that Hancock "harassed and closely watched" Bradley during the period in question, which, if proven at trial, "strongly suggests the possibility of a search for a pretextual basis for

discipline, which in turn suggests that subsequent discipline was for purposes of retaliation." *Yartzoff*, 809 F.2d at 1377 (citation omitted).

Especially relevant to show pretext, Bradley presents evidence that AutoZone treated a male employee who did not report harassment more favorably than her. *See Earl*, 658 F.3d at 1113 (citing *McDonnell Douglas*, 411 U.S. at 804 ("Especially relevant to [a showing of pretext] would be evidence that white employees involved in acts against [the employer] of comparable seriousness ... were nevertheless retained or rehired."). Hancock first recommended Bradley's termination in April 2019 because she had another employee already at the store cover the last few minutes of her shift without first telling Hancock and because she had supposedly left work early several times over the previous few weeks – although Hancock did not cite specific dates. A month later, Hancock again requested Hancock be terminated because another employee failed to finalize a return, and Bradley failed to correct it or contact Hancock as the store manager and instead the product in question was placed back onto the shelves, which created "an inventory discrepancy."  A few days later, Hancock stated in a corrective action he issued against Bradley that he had "no other recourse" but to ask for Bradley's termination as she had "numerous" memos and corrective actions in her file – which Hancock had placed there after Bradley made her report.

By contrast, Hancock did not recommend the termination of another male employee who "knowingly falsely returned [] merchandise the customer received so that the commercial cash drawer would balance for audit," which "is considered sliding merchandise and is against AZ policy and *considered theft*." *Hancock Dep.*, Ex. 16, Dkt. 33 at 7 (emphasis added). When this same employee a month later "cussed" out a fellow employee and smashed a monitor because he was angry, and then initially lied about it, claiming it was "an accident," Hancock again did not recommend his termination. Instead, after noting the employee had "anger issues," and these "issues" had now caused damage to store property and caused a few employees to be "concerned about working with him," Hancock only stated that the employee would "be coached on proper demeanor and company policy regarding actions of an AutoZoner." *Id.*, Dkt. 33 at 8. This employee's "anger issues" did not seem to improve over the ensuing four months, and other employees continued to complain about him, with one female employee stating that the employee intentionally tried to make her feel stupid. The employee was again "coached" on these issues but received no corrective action and kept his job.

This evidence raises a triable issue of pretext. AutoZone claims it fired Bradley because her job performance was "below acceptable for her position," but it did not fire another employee in the same position involved in acts of comparable or greater seriousness. AutoZone attempts to minimize its disparate treatment of

Bradley when compared to this other employee by arguing that Hancock cannot terminate any employee, and Hancock "simply documented performance issues" for this employee as he did for Bradley. But this argument ignores the evidence establishing that Hancock repeatedly requested that Bradley be terminated, and these repeated requests led directly to her being fired; yet, Hancock never once recommended the other employee be terminated despite his engaging in conduct a rational jury could find as significantly more egregious than the conduct that served as the basis for Bradley's termination. Reasonable jurors could therefore find that AutoZone's proffered reason is a pretext for retaliation.

"As the Ninth Circuit has repeatedly stated, 'a plaintiff's burden to raise a triable issue of pretext is hardly an onerous one.'" *Black*, 820 F. App'x at 551(quoting *Earl*, 658 F.3d at 1113); *see also Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170 (9th Cir. 2007). "Because motivations are often difficult to ascertain, 'such an inquiry should be left to the trier of fact' since impermissible motives are often easily masked 'behind a complex web of post hoc rationalizations.'" *Reece*, 713 F. Supp. 2d at 1231 (quoting *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1073 (9th Cir. 2003)).

Because Bradley has established a *prima facie* case of retaliation, and AutoZone has not shown an absence of material fact on the question whether it

would have taken the same action even without a retaliatory motive, the Court denies AutoZone's motion for summary judgment on Bradley's retaliation claim.

## ORDER

**IT IS ORDERED that:**

1.      Defendant's Motion for Summary Judgment (Dkt. 24) is **DENIED** in accordance with the Memorandum Decision set forth above. Within one week from the date of this decision, Plaintiff's counsel shall contact the Court's Clerk, Jamie Gearhart (334–9021) to arrange a telephone scheduling conference to schedule a trial and pretrial conference.

2.      Defendant's Motion for Leave to File Supplemental Declarations in Support of Defendant's Objections to the Materials Relied Upon By Plaintiff in Plaintiff's Statement of Disputed Facts in Opposition to Defendant's Motion for Summary Judgment (Dkt.  38) is **DENIED.**

DATED: May 4, 2022

B. Lynn Winmill
U.S. District Court Judge